UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Vladimir Vyrkin,

                              **Plaintiff,**

-against-

Triboro Bridge & Tunnel Authority, et al.,

                             **Defendants.**

1:18-cv-12106 (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, United States Magistrate Judge:**

       The *pro se* plaintiff, Vladimir Vyrkin ("Plaintiff" or "Mr. Vyrkin"), brought this action against the Triboro Bridge and Tunnel Authority (the "TBTA") and Officer Edwin Cabrera ("Officer Cabrera"), a Bridge and Tunnel Officer assigned to the Bronx-Whitestone Bridge, alleging various claims relating to Mr. Vyrkin's September 14, 2017 arrest on the Bronx-Whitestone Bridge.[1] (*See* Compl., ECF No. 5-1.) Following a Memorandum Opinion and Order by District Judge John G. Koeltl, there remains in this action a single claim, solely against Officer Cabrera, for excessive force in violation of 42 U.S.C. § 1983. *See Vyrkin v. Triboro Bridge & Tunnel Auth.*, No. 18-CV-12106 (JGK), 2021 WL 797654, at *9 (S.D.N.Y. Mar. 2, 2021).

       On April 14, 2021, the parties consented to my conducting all proceedings in this case (including trial) pursuant to 28 U.S.C. § 636. (Consent, ECF No. 61.) The Court conducted a bench trial on June 15, 2021. Having considered all the evidence and assessed the credibility of the

---

[1] Plaintiff originally brought this action in New York state court, but it was removed to this Court on the basis that Plaintiff asserted claims under federal law. (Not. of Removal, ECF No. 5, ¶ 8.) Plaintiff's Complaint also asserted claims against a third defendant, Captain Michael Barnwell, but Plaintiff voluntarily dismissed those claims on November 25, 2019. (Stip. Of Partial Dismissal, ECF No. 14.)

witnesses, the Court makes findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52, as set forth in this Opinion and Order.

## **FINDINGS OF FACT**[2]

The Court makes the following findings of fact after carefully considering the evidence before it.[3]

On September 14, 2017, Mr. Vyrkin was arrested at the toll plaza on the Bronx-Whitestone Bridge. (*See* Vyrkin Aff., ECF No. 67, at 1-2; Cabrera Decl., ECF No. 71-1, ¶¶ 14-15, 18; Kotas Decl., ECF No. 71-2, ¶¶ 6-7.) Mr. Vyrkin's vehicle was stuck behind a car at a closed toll gate in Lane 12, and he was arrested after he failed to follow the instructions provided to him by Officer Cabrera and Sergeant Hilda Ellis ("Sergeant Ellis").[4] (*See* Cabrera Decl. ¶¶ 8-9, 12-14; Vyrkin Aff. at 2.)

---

[2] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

[3] The parties submitted their direct testimony by sworn affidavit or declaration prior to trial, and cross-examination was conducted at trial.

[4] For context, in deciding the summary judgment motion that was before him in this case, Judge Koeltl explained the undisputed facts leading up to Mr. Vyrkin's arrest, as follows:

> At approximately 7:08 a.m. on September 14, 2017, Mr. Vyrkin entered lane 12 of the toll plaza of the Bronx-Whitestone Bridge in a red Chevrolet sedan. He was 75 years old. In order to enter lane 12, Mr. Vyrkin passed by a two-foot by three-foot sign affixed to an eight-foot pole at the entrance of lane 12 that read "DO NOT BACK UP 2 PT SUMMONS." Mr. Vyrkin was unable to pass through the toll in lane 12 because a vehicle in front of him was stopped. When he noticed that the vehicle in front of him was stopped, Mr. Vyrkin honked his horn and reversed his vehicle. While reversing, Mr. Vyrkin was immediately beside the sign prohibiting drivers from backing up. There was a school bus directly behind Mr. Vyrkin's vehicle.

> Officer Cabrera observed Mr. Vyrkin reversing his vehicle toward the school bus. Officer Cabrera, who was wearing a high-visibility reflective neon vest over his uniform and shield, first yelled for Mr. Vyrkin to stop reversing his vehicle and then approached Mr. Vyrkin's vehicle. Officer Cabrera then asked Mr. Vyrkin to produce his license and registration several times, but Mr. Vyrkin did not comply. Mr. Vyrkin also refused to move his vehicle to the side of the road. After Mr. Vyrkin refused to comply with Officer

The facts relevant to the force used by Officer Cabrera follow.[5]

I. <u>**Sworn Statements And Testimony By Mr. Vyrkin**</u>

According to Mr. Vyrkin's direct examination affidavit, Officer Cabrera "opened the door" of Mr. Vyrkin's vehicle and "started pulling [him] out." (Vyrkin Aff. at 2.) Mr. Vyrkin "was tied with a seat belt [and] was in pain." (*Id*.) Once out of the vehicle, Mr. Vyrkin was handcuffed and walked to the TBTA office where his handcuffs were "fastened . . . through a chain to the bench." (*See id*.) He then was "put . . . in a car and drove to" the New York City Police Department ("NYPD") 45th Precinct. (*See id*.) "In the car[, Mr. Vyrkin] was lying on an iron floor, tied with a short chain, [and] it was humiliating." (*Id*.)

On cross-examination at trial, Mr. Vyrkin testified that, while in the TBTA office, he initially had been rear cuffed with the chain that was attached to the bench fastened to the two handcuffs, but that another officer (later identified as Officer Michael Kotas ("Officer Kotas")) uncuffed one of his hands, such that, thereafter, only one of his hands was chained to the bench. (Trial Tr. ("Tr."), ECF No. 74, at 10.) Mr. Vyrkin also testified that the car that took him from the TBTA building to the NYPD 45th Precinct was a Chevy Impala and that it was about a ten- or fifteen-minute ride to the Precinct. (*Id*. at 12-13 (noting "it was very close").) Mr. Vyrkin admitted

---

> Cabrera's requests, Officer Cabrera called his sergeant for assistance. Sergeant Hilda Ellis arrived minutes later, dressed in her uniform. She also asked Mr. Vyrkin for his license and registration, but he did not comply. Because of his repeated non-compliance, Sergeant Ellis authorized Officer Cabrera to arrest the plaintiff. . . .

*Vyrkin*, 2021 WL 797654, at *1 (citations omitted).

[5] Mr. Vyrkin made statements in his direct examination affidavit regarding the circumstances surrounding his arrest. He also asked many questions at trial about his arrest. While the facts regarding Mr. Vyrkin's arrest provide background and context, they are not relevant to the issues currently before the Court since his false arrest claim previously was dismissed. *See Vyrkin*, 2021 WL 797654, at *3-4.

that, throughout the incident, he never asked for medical attention and never complained that he was in pain. (*See id*. at 13-14.)

Generally, I found Mr. Vyrkin to be a credible witness who remains deeply upset about the circumstances of his arrest. However, Mr. Vyrkin's arrest is not relevant to the issues before the Court. Most of Mr. Vyrkin's direct examination testimony, as well as all the other evidence introduced by him (*e.g.*, Plaintiff's Exhibits 1 through 7) has no bearing on whether Officer Cabrera used excessive force on Mr. Vyrkin. The only areas where I found Mr. Vyrkin to be less than credible concerned (1) the pain he allegedly felt when he walked from the toll lane to the TBTA building, and (2) whether a seat belt was placed on him during his transport to the NYPD 45th Precinct. First, Mr. Vyrkin testified at trial that, when Officer Cabrera escorted him to the TBTA building, "it was terribly painful for [him]" (Tr. at 9), and he stated in his direct examination affidavit that "[i]t hurt [him] to walk." (Vyrkin Aff. at 2.) Yet, as addressed below, from my observation of the video evidence, Mr. Vyrkin did not appear to have any difficulty walking. (*See* Findings of Fact Section IV, *infra*.) Moreover, Mr. Vyrkin never complained to anyone that he was in pain. (*See* Tr. at 11, 14.) Second, as addressed below, I credit Officer Kotas' testimony over Mr. Vyrkin's testimony and find that Officer Kotas was being truthful when he testified that a seat belt in fact was placed on Mr. Vyrkin in the back of the Chevy Impala. (*See* Findings of Fact Section III, *infra*.)

II. **<u>Sworn Statements And Testimony By Officer Cabrera</u>**

According to Officer Cabrera's direct examination declaration, after Sergeant Ellis directed him to remove Mr. Vyrkin from his vehicle, Officer Cabrera "opened Mr. Vyrkin's door, and [Mr. Vyrkin] disengaged his own seat belt." (Cabrera Decl. ¶¶ 14-15.) Then, after Mr. Vyrkin

4

exited his vehicle, Officer Cabrera "placed [Mr. Vyrkin] in handcuffs behind his back." (*Id*. ¶ 15.) Mr. Vyrkin "did not complain or make any comment about the handcuffs being too tight." (*Id*.)

Officer Cabrera states in his declaration that Mr. Vyrkin "appeared to have no difficulty walking across the approximately 14 toll lanes towards the [TBTA] [b]uilding" and "had no trouble stepping up and over the curbs at each toll plaza." (Cabrera Decl. ¶ 17.) Officer Cabrera further states that Mr. Vyrkin "did not make any expression, verbally or physically, about being in any discomfort," "did not complain that the handcuffs were too tight," "did not complain about any pain in his feet or legs" and "never requested any medical treatment of any sort." (*Id*.) At the TBTA building, one of Mr. Vyrkin's handcuffs was removed and he "was re-handcuffed to a bench."[6] (*Id*. ¶ 18.)

Officer Cabrera further states in his declaration that, about an hour later, he and Officer Kotas escorted Mr. Vyrkin to the NYPD 45th Precinct "so [Mr. Vyrkin] could be processed as an arrestee." (Cabrera Decl. ¶ 19.) "Mr. Vyrkin was rear cuffed and escorted to a TBTA patrol car[, which] was a modified Chevrolet Impala, with the rear seat replaced by a plastic bench." (*Id*.) According to Officer Cabrera, "[a] seatbelt was placed on Mr. Vyrkin and he sat in a normal position as we drove the five minutes to the 45th Precinct." (*Id*.) In addition, "[a]t no time during the ride did Mr. Vyrkin state that he was in any way uncomfortable or that the handcuffs were

---

[6] Officer Cabrera's direct examination declaration states that one of Mr. Vyrkin's handcuffs was removed "[o]nce [they] arrived at the [TBTA] [b]uilding." (Cabrera Decl. ¶ 18.) From the Court's observation of one of the videos contained in Defendant's Exhibit C, Officer Cabrera was mistaken when he stated that one of Mr. Vyrkin's handcuffs was removed upon arrival. Rather, as described in the discussion of the video evidence (and as Mr. Vyrkin testified (*see* Tr. at 10-11, 15)), Mr. Vyrkin initially was chained to the bench by Officer Cabrera with both hands handcuffed behind him, but Officer Kotas later removed one of the handcuffs, then re-chained him to the bench. (*See* Findings of Fact Section IV, *infra*.)

5

hurting him or too tight" and "[a]t no time during the ride was Mr. Vyrkin unsecured or on the floor of the vehicle." (*Id*.)

Upon examination by the Court at trial,[7] Officer Cabrera testified that he did not alter the vehicle that was used to transport Mr. Vyrkin to the NYPD 45th Precinct. (*See* Tr. at 30 ("The vehicle is in its state for everyone for transport.").)

With respect to the issue of excessive force, I found Officer Cabrera to be a credible witness. His sworn statements and testimony were consistent with a routine process for handcuffing and transporting an individual who had been arrested.

### III. Sworn Statements And Testimony By Officer Kotas

According to Officer Kotas' direct examination declaration, on September 14, 2017, Officer Kotas, who also was a Bridge and Tunnel Officer assigned to the Bronx-Whitestone Bridge, observed Officer Cabrera "escorting a handcuffed motorist [who he later learned was Mr. Vyrkin] towards the [TBTA] building." (Kotas Decl. ¶¶ 1, 4, 6.) Officer Kotas "observed that Mr. Vyrkin was walking without any indication of physical pain or distress" and "was walking normally and appeared to have no difficulty doing so." (*Id*. ¶ 6.)

Officer Kotas states in his declaration that, "[b]efore he was taken to the 45th Precinct, Mr. Vyrkin was escorted to an area of the [TBTA] [b]uilding with a bench and a restroom" and that "Mr. Vyrkin was seated on the bench, and he was handcuffed to the bench." (Kotas Decl. ¶ 8.) Officer Kotas "later entered the holding area [and] stayed with Mr. Vyrkin while Officer Cabrera went to another area of the [TBTA] [b]uilding to process paperwork for Mr. Vyrkin's

---

[7] As the Court explained to Mr. Vyrkin at trial, the questions asked by Mr. Vyrkin to Officer Cabrera on cross-examination related to the circumstances surrounding Mr. Vyrkin's arrest and were not relevant to the issue of whether Officer Cabrera used excessive force. (*See* Tr. at 27-28.)

6

arrest." (*Id*. ¶ 9.) According to Officer Kotas, "Mr. Vyrkin was chatting with [him] and his demeanor was calm and relaxed," and Mr. Vyrkin "never complained to [him] about any physical ailments, pain, or having difficulty walking or breathing" and "never complained that the handcuffs were hurting him." (*Id*.) Officer Kotas states that "[a]t one point [Mr. Vyrkin] asked to use the restroom and [Officer Kotas] uncuffed him so that he could do so." (*Id*.)

Officer Kotas states that he and Officer Cabrera escorted Mr. Vyrkin to the NYPD 45th Precinct "so he could be processed as an arrestee." (Kotas Decl. ¶ 11.) "Mr. Vyrkin was rear cuffed and escorted to a TBTA patrol car[, which] was a modified Chevrolet Impala, with the rear seat replaced by a plastic bench."[8] (*Id*.) According to Officer Kotas, Mr. Vyrkin "sat in the rear and had a seat belt placed on him" and Mr. Vyrkin never stated that he was uncomfortable or that the handcuffs were hurting him or were too tight. (*See id*. ¶ 12.)

Mr. Vyrkin chose not to cross-examine Officer Kotas at trial (*see* Tr. at 35), but instead praised him more than once. (*See id*. at 15 ("He was very attentive. He was very, like a well-wishing person, and he was very delicate"); *id*. (". . . I have nothing to complain of with respect to him. I am just grateful."); *id*. at 35 ("I want to say that Officer Kotas behaved in a dignified manner that an officer should behave as.").) On examination by the Court, consistent with his direct examination declaration (*see* Kotas Decl. ¶ 12), Officer Kotas testified that Mr. Vyrkin was secured by a seat belt in the vehicle that transported him to the NYPD 45th Precinct and that Mr. Vyrkin was not chained to the floor of the vehicle. (*See* Tr. at 35.) Although Mr. Vyrkin later asserted at trial that Officer Kotas failed to tell the truth and that "[n]obody put any seat belts on

---

[8] Attached to the Kotas direct examination declaration is an exhibit depicting a photograph of a vehicle like the one that transported Mr. Vyrkin. (*See* Kotas Decl. ¶ 12 & Ex. A.) The Court accepts this photograph as a demonstrative exhibit, not as substantive evidence.

7

[Mr. Vyrkin]" (*see* Tr. at 36-37), based upon the Court's observation of Officer Kotas' demeanor, as well as the praise that Mr. Vyrkin expressed for Officer Kotas, the Court credits Officer Kotas' testimony over Mr. Vyrkin's testimony.

IV.     **Video Evidence**

Defendant's Exhibit C contains two videos.[9] The first is a twelve-minute video of what transpired during the incident at lane 12 of the toll booth plaza. It shows Mr. Vyrkin's vehicle stopped behind the vehicle at the toll gate. At 8:45 on the video, a tow truck is backed into the toll lane in front of Mr. Vyrkin's vehicle. The tow truck obstructs the view of Mr. Vyrkin being removed from his vehicle. At 11:00, one can see that Mr. Vyrkin has been removed from his vehicle. From 11:46 to 11:58, one can see Mr. Vyrkin walking across other toll lanes, led by TBTA officers. His gait does not appear to be impaired in any way.

The second video contained as part of Defendant's Exhibit C was taken in a room inside the TBTA building where Mr. Vyrkin was detained and is about an hour in length. (See Def.'s Ex. 6.) The video shows Mr. Vyrkin being escorted into the room wearing rear handcuffs and then having his handcuffs chained to a bench at 1:56. It then shows Mr. Vyrkin sitting passively and speaking with Officer Cabrera. About seventeen minutes later, other officers, including Officer Kotas, enter the room and go in and out of the room over time. About six minutes later, Officer Kotas removes the cuff from Mr. Vyrkin's left hand, such that only Mr. Vyrkin's right hand is chained to the bench and he is sitting more comfortably at 23:55. Near the end of the one-hour

---

[9] Mr. Vyrkin consented at trial to the admission of these two videos into evidence. (*See* Tr. at 24-25, 29.) In addition, the Court notes that the direct examination declaration of William Matthews (Matthews Decl., ECF No. 71-3) properly authenticates the videos contained in Defendant's Exhibit C. *See* Fed. R. Evid. 901(b)(1).

video, at 56:06, Officer Kotas can be seen uncuffing Mr. Vyrkin so that he can use the restroom. At the end of the video, at 59:15, Officer Kotas rear cuffs Mr. Vyrkin and escorts him from the room.

## CONCLUSIONS OF LAW

The Court makes the following conclusions of law after considering the applicable legal standards.

### I. Legal Standards

To prevail on his claim under 42 U.S.C. § 1983, Plaintiff must prove, by a preponderance of the evidence, each of the following three elements: (1) that the acts complained of were committed by Officer Cabrera under color of state law; (2) that, in committing these acts, Officer Cabrera intentionally or recklessly deprived Plaintiff of his constitutional rights; and (3) that Officer Cabrera's acts were the proximate cause of injuries sustained by Plaintiff.[10] (*See* Jury Instructions in *Soto v. City of N.Y.*, No. 13-CV-08474 (S.D.N.Y. 2018), ECF No. 209, at 362-63, 370-71.)

Plaintiff asserts that Officer Cabrera acted with excessive force in violation of Plaintiff's constitutional rights. In his summary judgment opinion in this action, Judge Koeltl set forth the legal standards applicable to excessive force:

> The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under that Amendment's reasonableness standard. A police officer's use of force is excessive in violation of the Fourth Amendment if it is objectively unreasonable in light of the facts and circumstances known to the officer. To determine whether the amount of force

---

[10] There is no dispute that, at the time of the incident in question, Officer Cabrera was acting in his official capacity as a Bridge and Tunnel Officer for the TBTA, and thus was acting under color of state law. Because, as discussed below, I find that Plaintiff has not met his burden of proving a deprivation of his constitutional rights, I need not reach the question of whether Plaintiff has proven any injury.

applied to a plaintiff was unreasonable, courts consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. Excessive force claims require serious or harmful, not de minimis use of force.

. . .

On an excessive force claim regarding handcuffing, a plaintiff asserting a claim for excessive force need not always establish that the plaintiff alerted an officer to the fact that the handcuffs were too tight or causing pain, and the operative inquiry is whether an officer reasonably should have known during handcuffing that the officer's use of force was excessive. A plaintiff satisfies this threshold if the unreasonableness of the force was apparent or the plaintiff signaled the plaintiff's distress verbally or otherwise, such that a reasonable officer would have been aware of the plaintiff's pain.

*Vyrkin*, 2021 WL 797654, at *4-5 (citations, quotation marks & brackets omitted).

Officer Cabrera asserts that he is protected from liability by qualified immunity. In his prior opinion, Judge Koeltl set forth the legal standards for qualified immunity, as follows:

Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law. Even if defendants' actions were unreasonable under current law, qualified immunity protects officers from the sometimes hazy border between excessive and acceptable force.

*Vyrkin*, 2021 WL 797654, at *6 ((citations, quotation marks & brackets omitted).

## II. <u>Application</u>

The Court considers the use of force in three segments: (A) during the walk to the TBTA building; (B) in the room in the TBTA building; and (C) during Mr. Vyrkin's transport to the NYPD 45th Precinct.[11]

---

[11] The only other use of force involved Officer Cabrera's role in removing Mr. Vyrkin from his vehicle. Mr. Vyrkin states in his direct examination affidavit that he was "in pain," presumably from the fact that he was still wearing his seat belt, but that he then "unlocked the seat belt." (Vyrkin Aff. at 2.) In the

**A. During Walk To TBTA Building**

Based upon my consideration of all the evidence, including my observation of the video evidence, I find that Mr. Vyrkin has not met his burden to prove that Officer Cabrera used excessive force while escorting Mr. Vyrkin to the TBTA building. Mr. Vyrkin never complained that his handcuffs were too tight, nor was it apparent from the Court's review of the video evidence that the handcuffs were too tight. Mr. Vyrkin was walked slowly and carefully across the various toll lanes in order to get to the TBTA building. He was not pushed or rushed in any way. Simply put, Officer Cabrera acted in a reasonable manner during the subject escort.

**B. In TBTA Building**

The Court also finds that Mr. Vyrkin has not met his burden of proof to prevail on his claim against Officer Cabrera with respect to Mr. Vyrkin's time in the TBTA building. The 60-minute video of the room in the TBTA building does not show any excessive use of force upon Mr. Vyrkin. The video does not depict any objectively unreasonable conduct by Officer Cabrera. Further, it does not depict Mr. Vyrkin as being in any type of distress. Rather, Mr. Vyrkin appears at ease and relatively comfortable. Again, Mr. Vyrkin never complained that his handcuffs were too tight, nor was it apparent from the Court's review of the video evidence that the handcuffs were too tight.

**C. During Transport To NYPD 45th Precinct**

Finally, Mr. Vyrkin has not proven that Officer Cabrera used excessive force during Mr. Vyrkin's transport in the rear of the Chevy Impala to the NYPD 45th Precinct. In the first instance,

---

circumstances, the Court finds that Officer Cabrera's removal of Mr. Vyrkin from his vehicle was a de minimis use of force.

the Court notes that there were two officers involved in the transport, both Officer Cabrera and Officer Kotas. From the Court's review of the video evidence, it was Officer Kotas, not Officer Cabrera, who put the handcuffs on Mr. Vyrkin when he left the TBTA building for his transport to the 45th Precinct. There is nothing in the record evidence to suggest that Officer Cabrera did anything unusual or unreasonable during the transport, other than Mr. Vyrkin's testimony that was contradicted by Officer Kotas. As noted previously, the Court credits Officer Kotas' testimony that Mr. Vyrkin was secured by a seat belt in the rear of the vehicle.[12]

## CONCLUSION

For the foregoing reasons, it is hereby Ordered that judgment is rendered in favor of Officer Cabrera. The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

DATED:  New York, New York
         June 17, 2021

_____
STEWART D. AARON
United States Magistrate Judge

---

[12] Given that the Court finds no liability against Officer Cabrera under § 1983, the Court does not reach the issue of whether Officer Cabrera is entitled to qualified immunity. The Court notes, however, that the lack of any evidence that either Mr. Vyrkin or the "very attentive" and "well-wishing" Officer Kotas (Tr. at 15) raised any contemporaneous complaint or concern about Officer Cabrera's conduct strongly suggests it was objectively reasonable for Officer Cabrera to believe that any force he was employing was not in violation of clearly established law.